DAN P. AND CYNTHIA D. BUTTS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Butts v. Commissioner
Docket No. 18289-92
United States Tax Court
T.C. Memo 1993-478; 1993 Tax Ct. Memo LEXIS 487; 66 T.C.M. (CCH) 1041; October 18, 1993, Filed *487 Decision will be entered under Rule 155. For petitioners: V. Jean Owens. For respondent: J. Scot Simpson. PETERSON
PETERSON
MEMORANDUM FINDINGS OF FACT AND OPINION PETERSON, Special Trial Judge: This case was assigned pursuant to the provisions of section 7443A(b)(3) and Rules 180, 181, and 182. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Respondent determined a deficiency in petitioners' Federal income tax for their taxable year 1990 in the amount of $ 9,866. After a concession by respondent, the sole issue for decision is whether petitioner Dan P. Butts performed services for Allstate Insurance Company as an employee or as an independent contractor during the year at issue. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by reference. Petitioners resided in Palm Harbor, Florida, at the time their petition was filed. During the year in issue petitioner Dan P. Butts (Mr. Butts) was professionally associated with Allstate Insurance *488 Company (Allstate or Company) as an agent to solicit applications for various lines of insurance. Mr. Butts' relationship with Allstate was governed by the terms of two documents: (1) His Allstate Agent Compensation Agreement, executed with an effective date of January 13, 1974; and (2) an amendment to his Allstate Agent Compensation Agreement, executed with an effective date of February 1, 1987. Under the amended Allstate Agent Compensation Agreement, Mr. Butts assumed a newly created insurance sales agent position known as a Neighborhood Office Agent (NOA). We refer to both documents collectively as the "Agreement". Under the Agreement Mr. Butts agreed to devote all of his business time to selling Allstate insurance products. Mr. Butts was allowed to solicit such products throughout Florida, but not outside that State. Mr. Butts also agreed not to represent or solicit insurance for any other company without Allstate's prior written approval. As limited exceptions to this general rule, the Agreement allowed Mr. Butts both to write insurance applications under assigned risk plans (so long as Allstate participated in any such plan), and to represent any affiliate specified by *489 Allstate. During the year in issue Mr. Butts sold at least three types of insurance which were not Allstate insurance products. As an NOA, Mr. Butts assumed primary fiscal responsibility for the success of his career. During the year in issue he operated without any minimum compensation arrangement (earning income only through commissions on new business and renewals), and personally bore the obligation to pay for most of his business expenses. For example, under the Agreement, Mr. Butts was obligated to be the lessee of his own office space, and was obligated to operate the office with his own funds (e.g., payment of rent, utilities, and telephone). Further, Mr. Butts was required to pay for any personnel working in his office. During the year in issue Mr. Butts retained the services of two insurance agents and clerical help. These individuals were personally interviewed by Mr. Butts, who alone examined their qualifications and made the decision to hire. Mr. Butts fixed the terms and conditions of their services, maintained day-to-day authority over them, and established and paid their compensation. One insurance agent was paid on a salaried basis, and one was paid on commission. *490 In both cases, all commission income derived from insurance sales made by these agents belonged to Mr. Butts, who merely compensated the agents pursuant to whatever arrangements he made. Mr. Butts' decision to retain personnel was an exercise of professional judgment made in connection with his responsibility to operate his own office. Mr. Butts retained personnel only because he believed his office would operate more efficiently and profitably. Under the Agreement, Allstate played no role in determining whether Mr. Butts could or should hire personnel, other than reserving the right to approve personnel retained by Mr. Butts (generally obtained through background checks paid for by Mr. Butts), reserving the right to limit the number of agents who may occupy one office, and providing an administrative requirement that personnel retained by Mr. Butts be routed through a third-party employee leasing company approved by Allstate. This administrative requirement caused Mr. Butts to remit a 14.5 percent commission to an employee leasing company on top of the compensation he agreed to pay to his retained personnel (who actually received their compensation from the employee leasing *491 company, which sent Mr. Butts a weekly billing statement). Mr. Butts retained his personnel through the Great American Temporary Service during the year in issue. The Agreement did entitle Mr. Butts to an Office Expense Allowance (OEA) from Allstate, but the OEA was determined as a specific percentage of Mr. Butts' gross sales of Allstate insurance products (new business plus renewals) from the immediately preceding year, and during the year in issue it was an insufficient amount to reimburse him completely for incurred business expenses. Since Allstate bore no responsibility under the Agreement to reimburse Mr. Butts in any amount for business expenses exceeding the amount of his OEA, Mr. Butts personally bore the burden of paying the expenses exceeding his OEA during the year in issue. During the year in issue Mr. Butts incurred business expenses as an NOA in the amount of $ 61,323.35, and the amount of his OEA was $ 24,349.39. All of Mr. Butts' business expenses (utilities, phones, postage, office maintenance, payroll, computer leasing, business insurance, automobile, advertising, and miscellaneous business expenses) were legitimate business expenses and were reasonable in *492 amount. Independent of paying Mr. Butts an OEA, Allstate was obligated under the Agreement to provide Mr. Butts with a start-up office furniture package (e.g., desks, chairs, and coat trees). However, this furniture remained Allstate property while used by Mr. Butts and any personnel in his office, and Mr. Butts himself was responsible for purchasing or leasing operational supplies such as a copier, computer, fax machine, and telephone system. Also, Mr. Butts was entitled to receive "Cooperative Advertising" from Allstate, which was not a reimbursement for his advertising expenses, but rather meant that Allstate would supplement the amount Mr. Butts spent on advertising in order to increase his advertising budget. Mr. Butts was not restricted under the Agreement as to any particular manner of advertising, but, under the Agreement, he could not implement any advertisements without Allstate's prior approval. The Agreement required Mr. Butts to maintain regular office hours during the year in issue and to attend occasional training and development programs to learn about changes in the insurance industry and the features of new insurance products. However, at all times during the *493 year in issue Mr. Butts used his own style and methods to sell insurance. As part of his relationship with Allstate, Mr. Butts received fringe benefits during the year in issue, including: compensated vacation days; participation in an Allstate funded pension plan; matching funds for a portion of his 401(k) contributions; 75 percent contribution toward his health insurance plan; contribution toward payment of his group-life insurance premiums; coverage under errors and omissions malpractice insurance; and payment of his annual Florida insurance licensing fees. During the year in issue Mr. Butts had neither exclusive territorial rights nor any vested interest in any business produced under the Agreement's terms. Further, by its terms, the Agreement precluded transferability, and no rights or interests arising from it could be assigned without Allstate's consent. Under the Agreement, all records Mr. Butts maintained pertaining to Allstate policyholders were Allstate property and were required to be surrendered upon demand. Further, all premium payments collected or received by Mr. Butts were required to be treated as trust funds and promptly transmitted from Mr. Butts to Allstate *494 without deduction of any amounts due from Allstate to Mr. Butts and without Mr. Butts' making any other deductions for any purpose. Also, Allstate reserved the right to reject any insurance application or terminate or refuse to renew any policy. As an NOA, Mr. Butts generally had two meetings annually with an Allstate agency manager (an individual employed by Allstate to monitor insurance agents' operations who does not write insurance policies): one meeting during the beginning of a year during which Mr. Butts' last year's sales results were examined and new sales goals were set, and a second meeting near mid-year to check the progress of the set goals. During the year in issue either Mr. Butts or Allstate could terminate the Agreement by mailing written notice of termination to the other at his or its last known address. However, under the Agreement, Allstate could not terminate its relationship with Mr. Butts because of unsatisfactory work unless he had received prior notice that his work was unsatisfactory and had been given a reasonable opportunity to bring his performance up to "satisfactory standards", a term referring to an NOA's insurance sales performance in comparison *495 to other NOA's, based on relevant criteria. Under both the Allstate Agent Compensation Agreement and its amendment, Allstate considered Mr. Butts to be an employee. During the year in issue Allstate sent Mr. Butts a Form W-2 reflecting wages paid to him in the amount of $ 162,042.91. Mr. Butts reported this amount as wages earned on his Federal income tax return for taxable year 1990, and claimed a deduction for unreimbursed business expenses in the amount of $ 36,974 (the difference between the amount of his NOA business expenses ($ 61,323.35) and the amount of his OEA during the year in issue ($ 24,349.39)). Respondent does not challenge the amount of Mr. Butts' claimed business deductions, but argues that the expenses are deductible as Schedule A unreimbursed employee business expenses and not as Schedule C business expenses. OPINION Petitioners contend that Mr. Butts maintained a professional relationship with Allstate during the year in issue as an independent contractor. Respondent argues that Mr. Butts performed services for Allstate during the year in issue as an employee. Petitioners bear the burden of proving that the nature of Mr. Butts' professional relationship *496 with Allstate was not an employer/employee relationship. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Based on the record in this case, we conclude that petitioners have met their burden of proof. Whether an individual is an employee or an independent contractor is determined after examining relevant facts and circumstances and applying common law principles. Nationwide Mut. Ins. Co. v. Darden, 502 U.S.    ,    , 112 S.Ct. 1344, 1348 (1992); Matthews v. Commissioner, 92 T.C. 351, 360 (1989), affd. 907 F.2d 1173 (D.C. Cir. 1990); Professional & Executive Leasing, Inc. v. Commissioner, 89 T.C. 225, 232 (1987), affd. 862 F.2d 751 (9th Cir. 1988). No one fact is dispositive of the issue, but the "right to control" test is clearly the "master test" we use to determine the nature of a professional working relationship. Matthews v. Commissioner, supra at 361. Under this test, an employer/employee relationship exists when an alleged employer retains the "right *497 to control" the manner and means by which an alleged employee performs his services. Nationwide Mut. Ins. Co. v. Darden, supra; Simpson v. Commissioner, 64 T.C. 974, 984-985 (1975) (specifically dealing with insurance salesman); Ellison v. Commissioner, 55 T.C. 142, 152-153 (1970) (same). It is the right to control that is critical, and so we must examine not merely control actually asserted over the details of an alleged employee's performance, but also the degree to which an alleged employer may intervene to impose such control. Radio City Music Hall Corp. v. United States, 135 F.2d 715, 717 (2d Cir. 1943); Detorres v. Commissioner, T.C. Memo. 1993-161. Respondent argues that the record in this case shows that during the year in issue Allstate exercised control or had the right to exercise control over Mr. Butts' professional behavior to such a degree that we must conclude he worked for Allstate as an employee. In support of her position respondent emphasizes: (1) Provisions of the Agreement restricting Mr. Butts' handling of premiums received; *498 (2) restrictions in the Agreement as to Mr. Butts' ability to sell insurance for other companies; (3) restrictions in the Agreement precluding the transferability of interests; (4) the Agreement's preclusion of a vested interest for Mr. Butts in his book of business; and (5) one of the Agreement's discharge provisions. However, based on the record in this case and settled legal principles, we conclude that respondent's emphasis on these Agreement provisions is misplaced. In fact, with the exception of respondent's argument regarding one of the Agreement's discharge provisions, we have previously addressed whether the types of restrictions respondent points to in this case bear on an insurance company's control of an insurance agent's professional behavior, and we have squarely concluded that they have no bearing on such inquiry. Simpson v. Commissioner, 64 T.C. 974, 986-987 (1975). After due consideration, we similarly reject the relationship respondent proposes in this case between one of the Agreement's discharge provisions and the notion of control or right to control an insurance agent's professional behavior. Respondent argues that the discharge *499 provision in the Agreement guaranteeing that Mr. Butts will not be terminated because of unsatisfactory performance unless he has previously been given notice that his work is unsatisfactory and his position is in jeopardy and has been provided a reasonable opportunity to bring his performance up to satisfactory standards, is, in substance, a provision providing Allstate with the "right to control" the manner in which Mr. Butts performs his work as an NOA. Respondent grounds this argument on the testimony of Barry Hutton (Mr. Hutton), an Allstate sales director from the company's home office in Northbrook, Illinois. At trial, Mr. Hutton testified that each yearend, an NOA's production performance (dollar volume of gross sales and renewals) is examined by an Allstate agency manager who completes a written evaluation for the Company, comparing the NOA's actual sales productivity both to the NOA's goals set at the beginning of that yearend to the yearend productivity levels of peer NOA's. Mr. Hutton stated that if an NOA's performance is low enough, that is, so significantly below that of his peer group average that it is deemed a "severe situation", Allstate may impose a "work plan" *500 upon the NOA. In a work plan situation, an agency manager will contact a low producing NOA to discuss ideas and methods on how to bring the NOA's sales performance in line with peers. While the work plan situation can take the basic form of a discussion targeted to resolve a particular problem with a single suggestion (e.g., the NOA is not "asking enough questions to find out enough about the insured to properly rate them"), Mr. Hutton described the work plan situation as a progressive disciplinary process, whereby an NOA's continual inability to improve his performance (over what sort of time frame is unclear) will lead to increasingly significant corporate input on the performance problem. Mr. Hutton testified that in the most severe situations, Allstate may even require the NOA to meet with an agency manager every morning to agree on goals for that particular day, and to meet with a sales director (like Mr. Hutton) at the end of the work day to discuss what work was accomplished. According to Mr. Hutton, an NOA's inability to resolve his poor performance can lead to his termination, and he stated that in fact such terminations have occurred. Respondent contends that while *501 Mr. Butts' performance during the year in issue was such that he may not have been required to undergo the progressive disciplinary process, the mere potential of having to undergo the process imbued Allstate with a "right to control" significant enough to warrant our concluding that Mr. Butts was an Allstate employee during the year in issue. We disagree. After due consideration of the discharge provision in question, we conclude that it simply reflected both the importance Allstate attached to sales productivity and its willingness to provide low producing NOA's with an opportunity to bring productivity to acceptable levels prior to being terminated. Crucially, nowhere does the record indicate that the discharge provision was tied to corporate control over the manner in which an unproductive NOA operated his business. Nothing in the record indicates that Allstate dictated the methods and means by which an unproductive NOA operated his business once the NOA was in the "work plan" system. For example, there is no indication that Allstate required unproductive NOA's to adopt any particular "canned" sales method, no evidence that Allstate required unproductive NOA's to maintain *502 longer or shorter business hours, no evidence that Allstate forced unproductive NOA's to release retained personnel, and no evidence that Allstate ordered unproductive NOA's to limit or increase the amount of money they wanted to spend on advertising, computer equipment or any other type of business expense. In effect, the record does not show in any fashion that when an NOA was in the "work plan" program, Allstate overrode the Agreement's unambiguous provision, and the clear impression we take from the entire record that, as an NOA, "you operate your own office". Had the record contained clear evidence showing that under the "work plan" situation an unproductive NOA was required to alter and conform his professional behavior to adhere to suggestions made by Allstate agency managers or face termination, we would be more persuaded by respondent's argument. This is so because we acknowledge that when an agent such as Mr. Butts, (whose professional relationship with Allstate could be terminated at any time by Allstate after the mailing of written notice to terminate) receives suggestions which in reality are mandatory pronouncements, the failure of which to follow will lead to termination, *503 it is unreasonable "to expect such a man to indulge in a game of bluff by flying in the face of the requirement and then waiting to see if he would indeed be terminated as an agent". Ellison v. Commissioner, 55 T.C. 142, 154 (1970). However, no such evidence exists in the record, and, in fact, a reading of the entire record reveals that Allstate was concerned with results, not the manner in which such results were achieved. We infer from a reading of the entire record that even under the "work plan" situation, Mr. Butts would have been his own man in the day-to-day conduct of his business activities, and would have been free to make all important business decisions without any substantial control or influence by Allstate. Mr. Hutton's own testimony further supports this inference since he testified only that some NOA's were terminated for failing to produce, and provided no indication that any NOA's were terminated for failing to follow any dictated means or methods of producing. Cf. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). *504 In essence, we think it reasonable to infer from Mr. Hutton's testimony and the remainder of the record that the sum and substance of Allstate's "work plan" situation is this: that it was simply a means of broadening communication between Allstate and unproductive NOA's. That is, it was a system designed to discuss sales methods employed by unproductive NOA's, to expose unproductive NOA's to new ideas and new methods (without mandating their use) and to chart improvements in production, before Allstate decided to terminate its professional relationship with any unproductive NOA. In fact, our interpretation of the operation and effect of the discharge provision is consistent with the corporate rationale underlying Allstate's creation of the NOA position. The record reveals that the essential purpose underlying Allstate's establishment of the NOA position was to offer Allstate agents the opportunity to distance themselves from corporate control and to permit them to seek maximum profit within their profession by operating with their own business judgment. The price the NOA's were forced to pay to obtain such control over their careers ("be your own boss", as one NOA testified) *505 was the willingness to run their own affairs, pay their own expenses, and, ultimately, risk incurring business losses. In its totality, we think the record clearly illustrates Allstate's concern regarding insurance sales productivity and the broad latitude NOA's were given to satisfy that concern. In this light, we conclude that the discharge provision in question did not imbue Allstate with the right to control Mr. Butts' professional behavior during the year in issue. We do consider the discharge provision to have imbued Allstate with the right to control the level of minimum acceptable sales productivity; however, we believe that the right to control minimum output is distinct from the right to control the manner and means by which such minimum output is achieved. Restated for clarity and emphasis, we conclude that under the discharge provision in question during the year in issue, Allstate had the right to control the minimum level of insurance sales Mr. Butts was required to achieve, but not the manner in which those sales were to be obtained. The discharge provision placed Mr. Butts "under the gun" to produce, not "under Allstate's thumb" to achieve performance in any particular *506 manner. Interpreted as such, we conclude that the discharge provision has no bearing on our examination of the control test. Respondent does highlight facts in the record that bear on our examination of the control test, but we find these facts insufficient to alter our view that Allstate did not control or have the right to control the manner in which Mr. Butts pursued his career as an NOA during the year in issue. Particularly, we are not persuaded by respondent's arguments that during the year in issue Mr. Butts was required to maintain regular business hours as an NOA and to attend training and development programs. First, based on the record in this case, we find that Allstate's requirement that NOA's maintain regular office hours was a broad notion reflecting the Company's concerns in providing a high standard of customer service, and in practice and effect was not a mandate that Mr. Butts spend certain specific hours in his office. Rather, the record clearly shows that during the year in issue, Mr. Butts set the specific hours of his office's operation to coincide with his personal and professional goals, using his own business judgment without any direction from Allstate *507 management. Second, it is also clear that while Mr. Butts was required to attend occasional training and development programs, these programs were designed to inform NOA's as to the nature and operation of new insurance products, and were not part of a pattern or practice used by Allstate to dictate how NOA's were required to sell insurance. In contrast, the record reveals that as an NOA, Mr. Butts' attitudes and methods of selling insurance, that is, the "when, where, why, and how" of selling insurance, were left to his professional discretion. Similarly, we do not consider Allstate's right under the Agreement to approve personnel retained by Mr. Butts as a material restriction on Mr. Butts' freedom to operate as an NOA pursuant to his own business judgment. This requirement did not preclude Mr. Butts in any way from hiring personnel or from maintaining complete autonomy over any retained personnel. In fact, since the record indicates that Allstate never even interviewed Mr. Butts' proposed personnel, we are inclined to conclude that the underlying purpose of the approval requirement was to satisfy Florida law mandating that Allstate submit to the State a certified statement *508 or affidavit showing that it investigated the moral character, fitness, and reputation of any proposed agent, adjuster, customer service representative, or managing general agent operating within Florida's boundaries. Fla. Stat. Ann. sec. 626.451 (West 1984 and Supp. 1993). In summary, based on the record in this case, we conclude that Allstate in practice showed no pattern of supervision and control over the manner in which Mr. Butts performed in his profession, and further, that Allstate did not have the right to control Mr. Butts' professional behavior during the year in issue. In reaching this conclusion we have been mindful, as respondent correctly indicates in her brief, that the degree of control necessary to establish an employer/employee relationship varies with the nature of the work, and is generally lower when applied to professional services than when applied to nonprofessional services. Reece v. Commissioner, T.C. Memo. 1992-335; Herman v. Commissioner, T.C. Memo. 1986-590. However, from our examination of the record in this case it appears that the Agreement's provision that as an NOA, Mr. Butts remained *509 under the "supervision" of Allstate sales management, "reflects, at best, a careless and imprecise usage of the English language." Simpson v. Commissioner, 64 T.C. 974, 987 (1975) (referring to use of the term "supervision" in an insurance company's employment booklet). Of course, control (while the "master-test") is not the only factor we consider when determining the nature of a professional working relationship. In this case, the record contains evidence as to various other factors relevant to our inquiry, some of which are more traditionally associated with an employer/employee relationship, and others which are more traditionally related to a worker's status as an independent contractor. For example, a worker's investment in his work facilities is clearly associated with status as an independent contractor, as is the possibility that the worker may sustain a loss from the operation of his business, and the fact that the worker retained personnel under his control. Simpson v. Commissioner, supra at 988. In this case, Mr. Butts clearly was responsible for investing in the facilities he used to sell insurance *510 as an NOA during the year in issue, certainly bore the risk of sustaining a monetary loss as an NOA, and also retained personnel whose terms and conditions of employment he fixed unilaterally. It is true that Allstate provided Mr. Butts with an OEA during the year in issue, which Mr. Butts freely applied to offset some of his business expenses. However, the record shows that even considering the OEA, Mr. Butts personally incurred $ 36,974 in business expenses, which amount equaled 60.2 percent of his total office expenses (all of which respondent admits were "ordinary and necessary" and reasonable in amount). Further, since the amount of Mr. Butts' OEA was derived as a percentage of his gross insurance sales during the prior year, we consider it a volatile measure that offered him little security as he operated his business. In fact, since Mr. Butts' sole form of compensation during the year in issue was in the form of commissions, he fully bore the risk of turning a profit or loss based upon his skill as an insurance salesman and his business acumen, notwithstanding the fact that he knew the amount of his OEA going into his fiscal year 1990. On the other hand, we recognize that *511 the record contains facts typical of an employer/employee relationship, such as, the fringe benefits paid to Mr. Butts during the year in issue, Mr. Butts' lack of vested benefit in his book of business, the long-term relationship between Allstate and Mr. Butts, the fact that Mr. Butts' work was a part of Allstate's regular business, the discharge provision permitting either Allstate or Mr. Butts to terminate their professional relationship at will by mailing notice to the other of its or his intent to terminate, the Agreement's express statement that Allstate considered Mr. Butts to be an employee, and the fact that Mr. Butts reported his income from Allstate as wages on his Federal income tax return for the taxable year 1990. However, we do not consider these facts significant enough to outweigh the inference we draw from the record that during the year in issue, Mr. Butts was professionally associated with Allstate as an independent contractor. In drawing this inference we are particularly persuaded by: (1) The high degree of control Mr. Butts exercised over the manner in which he operated his business; (2) the fact that Mr. Butts personally incurred most of his business expenses; *512 and (3) the fact that Mr. Butts bore the burden of risk of loss from his business as an NOA. Further, we are not persuaded to conclude otherwise by respondent's emphasis on the fact that the Agreement indicated that Allstate considered Mr. Butts to be an employee, and the fact that Mr. Butts reported his Allstate income as wages on his 1990 return. It is well settled that in determining the nature of a professional relationship our focus is on the actual relationship existing between the contracting parties, and that a contract purporting to establish an employer/employee relationship is not controlling where application of the common law factors to the facts and circumstances of a particular case establishes that no such relationship exists. Professional & Executive Leasing, Inc. v. Commissioner, 89 T.C. 225, 233 (1987), affd. 862 F.2d 751 (9th Cir. 1988). We apply a similar analysis in discounting the fact that Mr. Butts reported his Allstate income as wages on his 1990 return, and further note that, in fact, Mr. Butts was inconsistent in considering his professional status. The record shows that although Mr. Butts reported *513 his Allstate income as wages and deducted his unreimbursed business expenses on Schedule A, he deducted them directly from gross income (as would an independent contractor) rather than as miscellaneous itemized business deductions (as would an employee deducting unreimbursed employee business expenses). Accordingly, we do not draw the inference, as respondent suggests we should, that due to the Agreement's express terms and the manner in which Mr. Butts reported his Allstate income, the parties in this case mutually considered their relationship to be that of employer/employee. In conclusion, we hold that during the year in issue, Mr. Butts was professionally associated with Allstate as an independent contractor, and must report his business income and expenses on Schedule C. To reflect the above, Decision will be entered under Rule 155.