## A98A2131. SOWELL et al. v. BLACKMAN et al.
### (512 SE2d 713)

JOHNSON, Chief Judge.

J. R. Sowell, Jr. and his son, Randy Sowell, ("the Sowells") sued Hal S. Blackman and J. R. & S. T., Inc. ("Blackman") claiming tortious interference with a contractual relationship. The case was tried before a jury. At the conclusion of the Sowells' case, the trial court granted Blackman's motion for a directed verdict. The Sowells appeal. For the following reasons, we conclude there was sufficient evidence to require the case to go to the jury. It was therefore error to have granted a directed verdict, and the judgment of the trial court must be reversed.

Rick and Cheryl Boyer apparently were the sole shareholders and operators of Gym South, Inc., a gymnastics business for children. They also were the owners of the property and gymnasium building used by Gym South. The Boyers obtained a substantial loan using the gymnasium property as security. They were unable to make the monthly loan payments, and the lender foreclosed. As a result, the Boyers were required to move their gymnastics business to another facility.

The Boyers searched for rental property for their business. They found a building owned by the Sowells which appeared to fit their needs. The Sowells agreed to lease space in their building to the Boyers, and the parties executed a written lease (the "Sowell/Boyer lease"). The Boyers took possession of the rental property but abandoned it shortly thereafter.

Believing that the Boyers had been enticed by Hal Blackman to breach the lease, the Sowells brought suit against Blackman for tortious interference with a contractual relationship. The Sowells asserted at trial that Blackman interfered with their contract with the Boyers by persuading them to abandon the Sowells' rental property and refuse to pay rent. The Sowells presented evidence to show that they had incurred a loss of rent, the cost of extensive premises renovations which had been required to obtain an occupancy permit for the Boyers, the cost of repairing damages to their building which occurred when the Boyers moved, and the cost of disposing of a substantial amount of property which the Boyers abandoned outside the

Sowells' building. In granting a directed verdict, the trial court found the Sowells failed to introduce evidence, as to one element of their cause of action, sufficient to let their case go to the jury. For the following reasons, we disagree.

The record before us shows that before the trial court directed a verdict against them, the Sowells had produced evidence showing that Patricia Dutton, a real estate agent, had negotiated the Sowell/Boyer lease on behalf of the Sowells. The Boyers signed the lease in both their individual and corporate capacities. About a month after the lease was executed, Dutton received a call from Cheryl Boyer asking for a copy of the lease. She also told Dutton that business was not good and enrollment was down. A few days later, Dutton received a call from Hal Blackman. Blackman told her he had purchased the Boyers' old gymnasium building at an auction and he was going to dissolve Gym South and reopen it with the Boyers as employees. Blackman asked Dutton to talk to J. R. Sowell and encourage him to refund the Boyers' rent and deposit money. Dutton subsequently called Blackman and informed him that the Sowells had an enforceable lease and expected it to be enforced. A few days later, Dutton received a fax from Rick Boyer referring to Dutton's conversation with Blackman and indicating, "we cannot afford to pay rent at this time and will not be able to fulfill the remaining lease agreement. . . . We are heavily in debt and have decided to dissolve our company. Please do not hold us responsible for the lease. And please work with Hal Blackman on a new lease." Later that evening, Rick Boyer called Dutton and informed her that he was going to move the business back to the old Gym South building.

In late May, Dutton informed J. R. Sowell of Hal Blackman's call. About a week later, Blackman called Sowell directly. Blackman said he had bought the old Gym South building, was taking over the business, and would probably hire the Boyers. Although not a party to the Sowell/Boyer lease, Blackman also told Sowell that he wanted out of the lease and that the lease was not valid because it had an incorrect 30-day termination clause. Sowell informed Blackman that his lease agreement was with the Boyers. During this phone conversation, Blackman did not attempt to negotiate any type of lease with Sowell.

A few days later, a meeting was held between the Boyers, the Blackmans and J. R. Sowell. Blackman again asserted that the Sowell/Boyer lease was invalid. When asked if he had a copy of the lease, Blackman replied that he knew about it. During this meeting, Blackman did not assert that he had purchased the corporate assets of Gym South, but he did acknowledge that he did not currently own the old Gym South building as he had earlier claimed. Blackman made no attempt to negotiate a new lease with J. R. Sowell, and

neither he nor the Boyers claimed that the Sowell/Boyer lease had been timely terminated.

Subsequently, Cheryl Boyer called J. R. Sowell and told him to come pick up the June rent. When Sowell arrived at his rental property, the Boyers were busy, but Blackman, who was present, handed him a sealed envelope. Although the Boyers owed just over $2,000, the envelope contained only $1,500. The balance of the rent was never paid. Before Blackman became involved in the venture, the Boyers paid the rent on time.

Hal Blackman's children were enrolled as students of Gym South when it was located in the original gymnasium, and he was the president of the Gym South parents booster club. Blackman learned from a newspaper notice that the Boyers' gymnasium was going to be sold at auction. Shortly thereafter, Rick Boyer notified the parents club that the business would be moving to the Sowells' building. After the move, the Boyers asked Blackman for help because they were losing students. Blackman decided to buy Gym South's assets, including all its gymnastic equipment, from the Boyers. He later decided to buy the original Gym South building from its new owner. Blackman intended to hire a staff, including Rick Boyer. Blackman did not assume the Boyers' lease obligation to the Sowells or any other corporate debts.

Blackman gave the Boyers a $24,000 promissory note for the Gym South assets, payable in monthly installments of $200 with no interest. The note provided that it and all obligations thereunder would be extinguished if Boyer was terminated from or voluntarily terminated his employment with Blackman. According to Blackman, it was the Boyers' decision not to pay J. R. Sowell the entire month's rent for the month of June, and it was also Rick Boyer's idea to dissolve the Gym South corporation. The same day that Blackman bought the Gym South assets, Rick Boyer gave him a notice that Gym South had been dissolved and acknowledging that Rick Boyer now owned the $24,000 promissory note. Blackman incorporated his new company under the name of J. R. & S. T., Inc. He purchased the right to continue to use the trade name of "Gym South." At the time of this transaction, Blackman testified, he was not aware of the contents of the Boyers' lease with the Sowells.

Blackman denied that he meddled or interfered with the Boyers' business; rather, he claimed to have purchased the Gym South assets to ensure that a gymnastics school remained in Fayette County. Blackman denied that he ever told J. R. Sowell that the lease was invalid or that he ever discussed the lease with him. After he purchased the assets, Blackman was present at a meeting between the Boyers and J. R. Sowell. Sowell was not interested in discussing any short-term lease agreement with Blackman and maintained that he

had an enforceable lease with the Boyers. Blackman admitted that he told Sowell there was a "great possibility" that he would move Gym South out of the Sowells' building. Rick Boyer was employed by Blackman when the corporate assets were subsequently moved from the Sowells' building, and Rick Boyer directed the move.

1. To establish a cause of action for tortious interference with existing and prospective contractual relations, a claimant must show that the defendant acted improperly and without privilege; acted purposefully and with malice with the intent to injure; induced a breach of contractual obligations or caused a party or third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and by tortious conduct proximately caused damage to the plaintiff. *Disaster Svcs. v. ERC Partnership*, 228 Ga. App. 739, 740 (492 SE2d 526) (1997). The defendant must be a stranger to both the contract at issue and the business relationship giving rise to and underpinning the contract. *Atlanta Market &c. Co. v. McLane*, 269 Ga. 604, 610 (2) (503 SE2d 278) (1998).

In granting the motion for directed verdict, the trial court concluded there was no evidence of improper action or wrongful conduct on the part of Blackman. Because there exists sufficient circumstantial evidence to send this case to the jury, we must reverse.

Blackman asserted that he purchased the assets of the Gym South corporation so that gymnastic instruction could remain in Fayette County. He also testified that he did not interfere or meddle in the Boyers' business. As a general rule, a person has an absolute legal right to exercise his business judgment so long as his decisions are not in violation of the law or public policy. See *Hughes v. Reynolds*, 223 Ga. 727, 730 (157 SE2d 746) (1967); *Gray v. Ga. Real Estate Comm.*, 209 Ga. 301, 306 (71 SE2d 645) (1952). "The exercise of an absolute legal right is not and cannot be considered an interference with a contractual or potential contractual relationship." *Disaster Svcs.*, supra at 742. No liability exists for procuring a breach of contract when the breach is caused by the exercise of an absolute right. *Halverson v. Murzynski*, 226 Ga. App. 276, 277 (1) (487 SE2d 19) (1997). Accordingly, Blackman's exercise of business judgment to purchase the assets of Gym South and the original gymnasium building, to move the acquired assets back to the original building, and to hire Rick Boyer would not, standing alone, constitute an improper action or wrongful conduct. However, there is evidence that Blackman repeatedly stated that the Sowells' lease agreement with the Boyers was invalid and attempted to have J. R. Sowell agree not to enforce it. Blackman's assertions regarding the invalidity of the lease were made, on at least one occasion, in the presence of the Boyers. The evidence also shows that Blackman asked Dutton to intercede with J. R. Sowell so that the Boyers could get their security

deposit and rent back, and it was Blackman who handed J. R. Sowell the envelope containing only a portion of the June rent. This circumstantial evidence when combined with Blackman's other conduct, including the buying of the corporate assets, moving the assets, and immediately hiring Rick Boyer, is sufficient to create a jury issue as to each and every element of the claim of tortious interference with a contractual relationship.

2. A directed verdict may be granted only where there is no conflict in the evidence as to any material issue and the evidence and all reasonable deductions therefrom demand a particular verdict. *Westin Hotels v. Natkin Svc. Co.*, 192 Ga. App. 493, 494 (1) (385 SE2d 141) (1989). To avoid a directed verdict the plaintiff is not required, even when relying only on circumstantial evidence, to establish his contentions to the exclusion of every other reasonable hypothesis. A court cannot direct a verdict if there is any reasonable inference supported by evidence which would authorize a verdict to the contrary. Id. at 495 (1). The trial court erred in directing a verdict in favor of Blackman.

*Judgment reversed. Smith and Barnes, JJ., concur.*

DECIDED MARCH 1, 1999.

*Howard G. Slade*, for appellants.
*Philip S. Coe*, for appellees.