Paul E. LOCKETT, Plaintiff,

v.

ALLSTATE INSURANCE COMPANY,
Defendant.

No. 5:03CV285DF.

United States District Court,
M.D. Georgia,
Macon Division.

April 8, 2005.

Teresa Ann Saggese, Macon, GA, for Plaintiff.

Leslie De Lara Luck, Alston & Bird LLP, Robert P. Riordan, Alston & Bird LLP, Atlanta, GA, for Defendant.

FITZPATRICK, District Judge.

Plaintiff initiated this action after he was not able to purchase a book of business ("BOB") from a retiring Allstate agent. Now before the Court is Defendant's Motion for Summary Judgment (tab 33).

## I. STANDARD OF REVIEW

The Supreme Court has observed, "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Under Rule 56, summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548. In reviewing a motion for summary judgment, the court must view the evidence and all justifiable inferences in the light most favorable to the non-moving party, but the court may not make credibility determinations or weigh the evidence. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## II. FACTUAL BACKGROUND

Plaintiff, who is a fifty-three year old African–American male, is an agent with Defendant Allstate Insurance Company. Plaintiff began his employment with Defendant as an agent in 1974 after graduating from Fort Valley State University. Initially, Plaintiff worked out of the Sears department store in Macon, Georgia, and then in the Sears store in Warner Robins, Georgia. Since 1987, Plaintiff has worked in a stand-alone office; he originally shared office space with another agent but since 1989 has occupied his own space. On February 1, 1999, Plaintiff's employment status changed—he had been employed as a Neighborhood Office Agent ("NOA") but converted on this date to an R3001 exclusive agent. Pursuant to the conversion, Plaintiff's employment status

is no longer as an employee of Defendant, but, as of February 1, 1999, he is an independent contractor. Pursuant to the R3001 A Exclusive Agency Agreement ("the agreement"), which governs independent contractor agents, Plaintiff is paid a commission by Defendant for each policy that he sells and maintains, but operates the Lockett Agency ("the agency") independent from Defendant. Plaintiff is required to submit reports and records to Defendant and maintain his books for inspection. Any advertising that uses Defendant's name or trademark requires Defendant's approval and Defendant continues to provide Plaintiff, and all others governed by the agreement, with sales incentives and rewards. Defendant also owns the telephone number associated with Plaintiff's agency. Plaintiff is the key person, as designated by the agreement, for the agency and is responsible for staffing, maintaining, and paying taxes for the agency, and sets his own work schedule.

In the spring of 2002, Plaintiff inquired as to the possibility of purchasing retiring agent Frank Clements' BOB. Plaintiff asserts that he proposed to Mr. Clements a purchase price of $190,000.00 to be paid over five years and that the two men had reached a verbal understanding. Mr. Lockett communicated his interest to his immediate supervisor, Don Curtis, who in turn approached Dave Baumgardner, the Territory Manager, about Plaintiff's interest in purchasing the BOB. In response to his inquiry, both Mr. Baumgardner and Mr. Curtis informed Plaintiff that he did not meet all of the requirements for purchasing another agent's BOB, and both called special attention to the fact that Plaintiff did not possess the necessary securities licenses. At this time, in the correspondence from Mr. Curtis, Plaintiff was provided with the most recent copy of the Satellite and Mergers Requirements promulgated by Defendant, which was dated April 1, 2002. *See* Tab 47, Ex. 8. Plaintiff had also received a copy of these requirements, as they were in January 2002, as a part of the Exclusive Agency Independent Contractor Manual ("the manual"). *See* Tab 47, Ex. 6 Pg. 26–27. Plaintiff never submitted a purchase contract to Defendant for its approval, thus Defendant never denied any offer or proposal submitted by Plaintiff. After receiving the emails from Mr. Curtis and Mr. Baumgardner regarding the requirements for purchasing a BOB, Plaintiff took no further action. In October 2002, Plaintiff learned that the BOB had been awarded to Kevin Lashley, an outside purchaser whose father owned an agency in the same territory as Plaintiff's agency. Mr. Lashley is a white male under age forty.

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") in March 2003. His complaint alleges he was denied the opportunity to purchase the BOB because of his race and his age. After receiving his right to sue letter, Plaintiff initiated this action. Plaintiff brings a race discrimination claim pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"); an age discrimination claim under the Age Discrimination in Employment Act ("ADEA"); and state law claims for breach of agreement/loss of business opportunity; breach of independent contractor agreement; fraud, deceit, intentional/negligent misrepresentation; and, intentional interference with a contract.

## III. LEGAL DISCUSSION

Before discussing the merits of Plaintiff's claims, the Court must determine

whether Plaintiff has timely filed his charge of discrimination and whether his federal claims are bared by his employment status.

### A. Timeliness of Charge

Plaintiff filed his charge of discrimination with the EEOC on March 6, 2003. By his complaint, Plaintiff alleges that he learned of a discriminatory act against him on October 2, 2002. On this date, Plaintiff learned that the BOB had been awarded to Kevin Lasley. From Mr. Lashley's age and race, along with other factors, Plaintiff alleged in his EEOC complaint that he had been the victim of age and race discrimination. However, Defendant asserts that Plaintiff never made a formal attempt to purchase the BOB, pointing out that his only activity in this regard was the correspondence between Plaintiff and his supervisors, which occurred on March 25, 2002 and April 2, 2002. Thus, Defendant argues that Plaintiff's complaint was untimely since the only acts Plaintiff could point to as discriminatory occurred almost twelve months prior to the filing of Plaintiff's complaint.

■ Even if Defendant is correct about the dates of any possible discriminatory act, Plaintiff's complaint is still timely filed. "The time for filing an EEOC charge begins to run when the employee receives unequivocal notice of the adverse employment decision," and therefore, Plaintiff had 180 days to file his charge from the date he learned he had not been awarded the BOB. *Grayson v. K Mart Corp.,* 79 F.3d 1086, 1100 n. 19 (11th Cir. 1996). The only question remaining for the Court is whether, prior to October 2, 2002, the date Plaintiff learned that the BOB had been awarded to someone else, there were "facts which would support a charge of discrimination that were apparent or should be apparent to a person with a reasonably prudent regard for his rights." *Wright v. AmSouth Bancorporation,* 320 F.3d 1198, 1202 (11th Cir.2003) (citing *Sturniolo v. Sheaffer, Eaton, Inc.,* 15 F.3d 1023, 1025 (11th Cir.1994)). There is nothing in the record that would indicate Plaintiff received any further information regarding the BOB, much less that discrimination may have occurred in placing the BOB, until he learned that the BOB had definitively been awarded to someone else. Thus, the Court is satisfied that Plaintiff's EEOC charge was timely filed from the date he had unequivocal notice that he had not been selected to receive the BOB.

### B. Employee vs. Independent Contractor

■ The protection against discrimination that is afforded by Title VII and the ADEA is extended only to the employment relationship and is not afforded to independent contractors. *See Garcia v. Copenhaver, Bell & Assoc., M.D.'s, P.A.,* 104 F.3d 1256, 1259 (11th Cir.1997) ("The ADEA does not provide relief for discrimination against an independent contractor.") (internal citations omitted); *see also Zhengxing v. Tomlinson,* No. 02–5267, 2002 WL 31926829, *1 (D.C.Cir. Dec. 31, 2002) (citing *Spirides v. Reinhardt,* 613 F.2d 826, 829 (D.C.Cir.1979) (independent contractors are not covered by Title VII)). Thus, as this Court has previously reasoned "[i]f [Plaintiff] were an independent contractor, and not an ... employee of [Defendant], then there would be no "employment relationship" between the two and [he] would not be subject to Title VII's protections" or those offered by the ADEA. *Holloman v. Northeast Ga. Area Dev. Com'n,* 740 F.Supp. 1571, 1575–76

(M.D.Ga.1990). To decide whether Plaintiff was an employee or independent contractor, the Court will apply a hybrid economic realities test.[1] *See Cobb v. Sun Papers, Inc.*, 673 F.2d 337, 340–41 (11th Cir.1982); *see also Cuddeback v. Fla. Bd. of Educ.*, 381 F.3d 1230, 1234 (11th Cir. 2004) (stating "this circuit has adopted the 'economic realities' test to determine whether a Title VII plaintiff is an employee").[2] This test looks "at the economic realities of the situation," but "the focus of the inquiry is the employer's right to control the 'means and manner' of the worker's performance." *Oestman v. Nat'l Farmers Union Ins. Co.*, 958 F.2d 303, 305 (10th Cir.1992) (quoting *Spirides*, 613 F.2d at 831). In addition, the hybrid test considers common-law agency principles:

(1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the employer or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated, i.e., by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the employer; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays Social Security taxes; (11) the intention of the parties.

*Cobb*, 673 F.2d at 340. Consequently, the Court will first consider the common law principles, and then Defendant's control over Plaintiff, and finally view the economic realities of the situation in light of the first two inquiries.[3]

### 1. Common Law Principles

Applying each of the eleven principles to the situation at hand, the Court finds that

---

**1.** Plaintiff asserts that a common-law test for determining who qualifies as an employee should be employed by the Court and cites *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992) for that proposition. The Supreme Court did adopt a common-law test in *Darden*, but stated specifically that "we adopt a common-law test for determining who qualifies as an 'employee' under ERISA...." *Id.* at 323, 112 S.Ct. 1344. Plaintiff's action is not under ERISA and questions regarding employment status under the federal discrimination statutes are governed by the hybrid test in this circuit. *See Cobb*, 673 F.2d at 341.

**2.** The Court cites a Title VII discrimination case in this instance realizing that "[b]oth Title VII and ADEA's definitions of employee are virtually identical" and are applied and analyzed in the same manner, such that the hybrid economic realities test covers both of Plaintiff's federal discrimination claims. *Garcia*, 104 F.3d at 1265.

**3.** The Court notes that deciding the question of Plaintiff's employment status is properly considered at this stage. In this matter, the factual issues surrounding Plaintiff's employment are not in dispute, rather, what is disputed is the legal conclusion to be drawn from those facts. And, because the "[r]esolution of factors as 'to whether an employment relationship or an independent contractor relationship was created' is a question of law" the Court is able to make this determination at the summary judgment stage. *Farlow v. Wachovia Bank of N. C., N.A.*, 259 F.3d 309, 313 (4th Cir.2001) (citing *Cilecek v. Inova Health Sys. Servs.*, 115 F.3d 256, 261 (4th Cir.1997)); *see also Weary v. Cochran*, 377 F.3d 522, 524 (6th Cir.2004) ("The determination of whether a plaintiff qualifies as an employee under the [ADEA] is a mixed question of law and fact that a judge normally can make as a matter of law.") (internal citations omitted).

Plaintiff is likely an independent contractor. Plaintiff's job selling insurance is specialized and he works independently in his own office. Plaintiff is licensed by the state of Georgia to sell insurance and is a long-term professional in the insurance industry. Thus, the first factor, whether the individual works under the direction of a supervisor or is a self-sufficient specialist, points in favor of Plaintiff being an independent contractor. *See Schwieger v. Farm Bureau Ins. Co.*, 207 F.3d 480, 485 (8th Cir.2000) (finding "factor weighs heavily in favor of independent contractor status" when agent considered herself professional, had state license). Plaintiff is a professional, his position requires substantial training, licensing, and expertise, so the second factor points towards his status as an independent contractor. *See Stewart v. Midani*, 525 F.Supp. 843, 849 (N.D.Ga.1981) ("The more skilled the employee, the more likely he is an independent contractor.") As for the third factor, even though Defendant owns the phone number used by the agency and provides some promotional and office materials, Plaintiff is responsible for providing the office space, equipment, products, and staff that maintain the agency. *See Santelices v. Cable Wiring*, 147 F.Supp.2d 1313, 1320 (S.D.Fla.2001) (noting that owning own equipment and tools used on job is analogous with independent contractor status). Plaintiff is paid by commission, he receives a set amount for each policy he sells and each policy he maintains. Thus, his compensation is determined by his productivity, which indicates, by the fifth factor, that he is likely an independent contractor. *See Sica v. Equitable Life Assurance Soc'y of the U.S.*, 756 F.Supp. 539, 542 (S.D.Fla. 1990) ("Sica's method of compensation was by commission, as opposed to on a salary basis—a further indication of his status as

an independent contractor."); *see also Birchem v. Knights of Columbus*, 116 F.3d 310, 313 (8th Cir.1997) (finding that payment by commission signaled independent contractor); *John Cooper Produce, Inc. v. Paxton Nat'l Ins. Co.*, 774 F.2d 433 (11th Cir.1985) (per curiam) (inferring independent contractor status from payment by commission). As for termination, the sixth factor, either party can terminate the agreement between Plaintiff and Defendant, which gives Defendant no greater authority to fire Plaintiff than Plaintiff has ability to resign. *See Sica*, 756 F.Supp. at 542 (noting that equal ability to fire and resign indicated independent contractor status). In addition, "the right to ... fire employees of the employee indicates the existence of a master/servant relationship," so, the fact that Plaintiff alone controls his staff evidences an independent contractor relationship. *Harris v. City of Chattanooga*, 507 F.Supp. 365, 372 (N.D.Ga.1980). Factor seven also indicates an independent contractor relationship since Plaintiff does not receive sick leave, vacation time, or any sort of annual leave from his relationship with Defendant. Likewise, factor nine evidences an independent contractor relationship as Defendant is entirely responsible for his own retirement. The retirement benefits Plaintiff accrued while he was Defendant's employee were frozen when he entered into the agreement and he currently receives no benefits from Defendant. Factor ten clearly points towards an independent contractor relationship since Plaintiff, under the agreement, pays all taxes associated with the agency and his employment. *Compare McKenzie v. Davenport–Harris Funeral Home*, 834 F.2d 930, 934 (11th Cir.1987) (stating that deduction of social security, federal and state taxes from McKenzie's commission checks indicated that "she was regarded as

a saleswoman, and not merely as an independent contractor").

The fourth common law factor, length of time of employment, however, is not instructive to the Court with regard to determining Plaintiff's employment status. Plaintiff has been affiliated with Defendant for over thirty years, but beginning in 1999 he was designated an independent contractor. Typically, the longer an employment relationship the more likely an individual is an employee. *See Wilson v. United Farm Bureau Mut. Ins. Co.*, No. IP 93–1460–C H/G, 1995 WL 378521, *8 (S.D.Ind. Jun. 15, 1995) (noting that independent contractor arrangement more likely for specified, shorter period of time or for performance of certain goal). But, in this instance, because the twenty-five year employer/employee relationship was changed when Plaintiff agreed to become an independent contractor, and that relationship, especially in 2002, is relatively short in duration, this factor is not valuable in the analysis of Plaintiff's employment status.

Nevertheless, the eighth factor is instructive as to the employment relationship between the parties. The sale of individual insurance policies is central to Defendant's business and Plaintiff's work in that regard is an integral part of Defendant's business. Such that, the eighth factor weighs in favor of Plaintiff being an employee. *See Weary*, 377 F.3d at 528 (noting that individual is likely employee when work is regular part of hiring party's business).

The most disputed common law principle is the intention of the parties. The agreement clearly articulates that Plaintiff is an independent contractor. *See* Tab 47, Ex. 5 Pg. 1 ¶ IB ("The relationship between [Defendant] and Agency, its officers, directors, shareholders, members, employees, and other persons working in connection with this Agreement, will be that of independent contractor."). Indeed, Plaintiff admits that he understood after February 1, 1999 he would no longer be an employee of Defendant, but rather an independent contractor. *See* Tab 47, Pl.'s Dep. Pg. 26. However, Plaintiff contends that his conversion from employee to independent contractor was not completely voluntary and that he did not, at the time of the conversion, understand the full ramifications of the conversion. *See* Tab 47, Pl.'s Dep. Pg. 24–26. Based on this lack of understanding, Plaintiff questions his intention to be classified as an independent contractor. Even though Plaintiff now attempts to undermine his intention to be bound by the agreement, it is clear from the agreement that at the time the agreement was entered into both parties designated Plaintiff as an independent contractor. As the terms of the agreement serve as the manifestation of the parties' intent, it is apparent that the parties intended for Plaintiff to operate as an independent contractor. *See Bates v. Variable Annuity Life Ins. Co.*, 200 F.Supp.2d 1375, 1379 (N.D.Ga. 2002) (looking to terms of contract to find insurance agent independent contractor for purposes of ADEA); *see also Gordon v. Birmingham News*, No. CV89–PT–0436–S, 1989 WL 222730 *2 (N.D.Ala. Jun. 27, 1989) (looking at applicable paragraph of contract for clear intention of parties).

In sum, the totality of the common law agency principles indicate that Plaintiff is an independent contractor; nine factors signal independent contractor status, one would find Plaintiff an employee, and one is not directly instructive.

### 2. Right to Control

■ Turning to consider Defendant's right to control Plaintiff, the Court is

mindful that when "an employer has the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist." *Cobb,* 673 F.2d at 340. In response to Defendant's assertion that he is an independent contractor, Plaintiff points out Defendant's continuing involvement in the agency in an effort to characterize his employment relationship as that of employer/employee.[4] Plaintiff no doubt undertakes this effort to contradict the clear language in the agreement because "where the contract of employment clearly denominates the other party as an independent contractor, that relationship is presumed to be true unless the evidence shows that the employer assumed such control." *Johns v. Jarrard,* 927 F.2d 551, 556 (11th Cir.1991) (quoting *Bartlett v. Northside Realty Assoc., Inc.,* 191 Ga.App. 10, 380 S.E.2d 744, 745 (1979)).

Plaintiff points to the agreement, its terms, conditions and restrictions for his argument that he is an employee. As Plaintiff notes he is bound by the agreement. However, it is logical that even in an independent contractor relationship the parties would be bound to the working relationship by a contract, such as the agreement in this case. *See id.* at 556 (implying that contracts govern independent contractor relationship by looking "under the contract either oral or written" to determine if "the right to control the time, manner, and method of executing the work, as distinguished from the right to ... require certain definite results" is present). The agreement does contain restrictions, terms, and conditions under which the agency and Plaintiff, as the agency's key person, are to operate. Plaintiff also has a continuing obligation to keep Defendant informed with regard to sales figures, contracts entered into, and policy applications. But, as did the insurance agent in *Bates,* Plaintiff has "complete latitude and discretion in how to service existing clients and how to acquire new business." 200 F.Supp.2d at 1380. Furthermore, Defendant "exercised no control over how many clients [Plaintiff] visited or contacted each week, which clients he visited or contacted, or the method by which he dealt with his clients on a day-to-day basis." *Id.* Defendant's lack of involvement in the daily details of the agency would align Plaintiff as an independent contractor. Especially since, even though Defendant required Plaintiff, as the agency's key person, to remain actively involved with the agency, Plaintiff was allowed to set his own work hours and schedule. *See id.* at 1380 ("Bates was free to set his own work schedule and to work whenever he saw fit."); *see also Desimone v. Allstate Ins. Co.,* Nos. C 96–03606 CW, C 99–02074 CW, 2000 WL 1811385, *12 (N.D.Cal. Nov. 7, 2000) (finding insurance agents independent contractors in part because not subject to restrictions on when they must be at work).

While Defendant provided incentives, assistance, and materials for Plaintiff to use in the agency, Defendant did not direct how or when Plaintiff was to conduct his business nor was he given sales quotas or specific directives. The sales goals and objectives that were articulated for Plaintiff are evidence of Defendant's "right to

---

**4.** Defendant states in its reply brief that Plaintiff has made twenty-one statements in an effort to show that Defendant controls the means and manner of his work. The Court has grouped the statements collectively by subject matter and will not number or address each individually.

control minimum output," which "is distinct from the right to control the manner and means by which such minimum output is achieved." *Butts v. CIR*, 1993 WL 410704, 66 T.C.M. (CCH) 1041 (1993). Since, "[t]ypically an employer has a right to control the progress of an employee's work but does not have the right to control the progress of an independent contractor's work," the absence of controlling authority over Plaintiff's work schedule also indicates that he is an independent contractor. *In re Montoya*, 77 B.R. 926, 929 (Bankr.M.D.Fla.1987).

The bonuses, awards, and prizes Defendant offers from time to time do not rise to the level of control or influence over Plaintiff's daily business, these awards merely serve to reward productivity over an extended period. *See C.C.E., Inc. v. Nat'l Labor Relations Bd.*, 60 F.3d 855, 858 (D.C.Cir.1995) (finding that steps taken to "monitor, evaluate, and improve" the results of work without supervision over manner and means by which work is done indicates independent contractor status). Defendant does not direct the pace or composition of Plaintiff's work or workday, likely making Plaintiff an independent contractor. Indeed, the touchstone of this determination is the "hiring party's right to control the manner and means by which the work is accomplished." *Daughtrey v. Honeywell, Inc.*, 3 F.3d 1488, 1496 (11th Cir.1993). And, Defendant's minimal role in suggesting or controlling the manner and means by which Plaintiff conducts his daily business at the agency suggests that Plaintiff was not an employee.

In addition, the Court is instructed to evaluate "whether the defendant directed the plaintiff's work and provided or paid for the materials used in the plaintiff's work" to decide if Plaintiff was an employ-ee or independent contractor. *Cuddeback*, 381 F.3d at 1234. Unlike the graduate student in *Cuddeback*, who was furnished the laboratory in which she worked and all the supplies and materials necessary for her research, Plaintiff provides his own office supplies, materials, and even his own office location, although Defendant must approve the office location Plaintiff selects. Defendant does provide some advertising material that contains the Allstate trademark and other informational product materials, but these supplies fall far short of comprising the bulk Plaintiff's work materials. *See Wolcott v. Nationwide Mut. Ins. Co.*, 884 F.2d 245, 251 (6th Cir.1989) (finding responsibility for own office space, supplies indicative of independent contractor status). Even though Plaintiff is required to use these promotional materials and product forms provided by Defendant, this requirement does not intrude onto Plaintiff's ability to control his business day. *See Kirby v. Robby Len Swimfashions*, 904 F.2d 36, 1990 WL 72322 (6th Cir.1990) (reasoning that use of company forms and paperwork resulted in only minimal infringement to Kirby's discretion in the affairs of his business).

Also, with regard to ownership, Plaintiff points out that Defendant owns the insurance contracts he sells. Because these contracts are Defendant's property, Plaintiff must maintain his account and business records for inspection by Defendant, and according to Plaintiff, this indicates control sufficient to deem him an employee. However, this reporting requirement is not an attempt to exercise control over how Plaintiff sells insurance to customers on a daily basis, rather it is a way to monitor results and insure accuracy. *See Desimone*, 2000 WL 1811385 at *13 (finding that monitoring results did not equate to controlling manner and means by which

work accomplished). In addition, because Defendant owns the policies agents sell, it requires prior approval before an agent may transfer a BOB, and Plaintiff cites this as further evidence of Defendant's control. Again, this requirement does not intrude on Plaintiff's ability to conduct daily business, nor does it substantially interfere with the transfer of a BOB. Plaintiff also asserts that the fact that he is paid by commission makes him an employee. This position taken by Plaintiff, however, is contrary to common understanding, since payment by commission is recognized as signaling an independent contractor relationship. See *Sica,* 756 F.Supp. at 542; *see also Birchem,* 116 F.3d at 313; *John Cooper Produce, Inc.,* 774 F.2d 433.

Furthermore, Plaintiff argues that Defendant exercises control over him by requiring him to seek approval for various business activities. Plaintiff mentions the restrictions Defendant places on advertising, but advertising restrictions do not make Plaintiff an employee. See *Alberty–Velez v. Corporacion de Puerto Rico Para La Difusion Publica,* 361 F.3d 1, 8 n. 8 (1st Cir.2004) ("A company may require that it provide prior approval before an independent contractor takes action or associates with an entity that could reflect poorly on the company."); *see also Oestman,* 958 F.2d at 306 (stating that requiring insurance agent to submit advertisements for pre-approval is not necessarily indicative of employee status because company has "substantial interest" in advertising reflecting company standards, even if advertisement issued by independent contractor).

Additionally, the reason Defendant restricts advertising that incorporates the Allstate name or trademark is likely for its own protection, and not to interfere with Plaintiff's business, as there are no restrictions on advertising that does not contain symbols, names, or marks that Allstate wishes to protect. See *Desimone,* 2000 WL 1811385 at *12 (determining that because agents had sole discretion over when, how much, where to advertise, Allstate restrictions were only to maintain control over "own name, marks, and goodwill"). In response, Plaintiff argues that the presence of protected information and a confidentiality agreement are additional evidence that he is an employee. However, confidentiality and non-competition agreements are not exclusive to the employer/employee relationship, and do not, in this context, indicate employee status. *See Jay's Custom Stringing, Inc. v. Yu,* No. 01CIV.1690, 2001 WL 761067, *3 (S.D.N.Y. July 6, 2001) (stating that independent contractor required to sign confidentiality agreement and non-competition agreement); *see also Follett Corp. v. Willis,* No. 97 C 6407, 1998 WL 249229 (S.D.Ill. May 11, 1998) (finding that parties entered into an independent contractor agreement and a non-competition and confidentiality agreement).

And, Plaintiff points to his inability to sell insurance for other companies. However, when considering the restriction on an agent to sell exclusively for one insurance company and whether that restriction determined if the agent was an independent contractor, other courts have noted that "[a]n insurance agent's status as a captive agent, . . . , is no more determinative of the issue presented than, for example, a manufacturer's representative's agreement to market the manufacturer's products exclusively." *Alfred v. Tenn. Farmers Mut. Ins. Co.,* 8 F.Supp.2d 1024, 1028 (E.D.Tenn.1997). And, therefore, the fact that Plaintiff is an exclusive agent for Defendant does not make him an employee of Defendant.

In additional attempts to show Defendant's control over the manner and means of his business, Plaintiff points out that Defendant has the ability to alter the terms of the agreement, and that he must follow the administrative guidelines contained within the agreement. However, this "limited authority retained over these aspects of [Plaintiff's] work" is not the type of control necessary to find an employer/employee relationship. *Weary,* 377 F.3d at 526; see also *Strange v. Nationwide Mutual Ins. Co.,* No. CIV. A. 93-6585, 1997 WL 550016 at *5, 7 (E.D.Pa. Aug. 21, 1997) (noting that the continuous oversight of insurance agents is compatible with independent contractor status given the heavily regulated nature of the insurance industry).

Plaintiff has shown the Court that Defendant sets the terms and conditions for aspects of his work as an agent, but the Court is not convinced that, under the agreement, Defendant " 'assumes the right to control the time, manner, and method of executing the work, as distinguished from the right merely to require certain definite results in conformity to the contract.' " *Johns,* 927 F.2d at 556 (quoting *Brown v. Coastal Emergency Serv., Inc.,* 181 Ga. App. 893, 354 S.E.2d 632, 634–35 (1987)). Indeed, it is apparent from the record that "the when, where, why, and how of selling insurance, were left to [Plaintiff's] professional discretion." *Butts,* 66 T.C.M. at 1041. And, therefore, Defendant does not have sufficient control over Plaintiff to find him Defendant's employee.

### 3. Economic Realities

■ In discrimination cases, to determine employment status, the Eleventh Circuit has "adopted a hybrid approach, which adheres to the common-law test, tempered by a consideration of the economic realities of the hired party's relationship with the hiring party." *Daughtrey,* 3 F.3d at 1495. Financial interdependence is a factor that should be considered when determining whether an individual is an employee or independent contractor. *See N.L.R.B. v. O'Hare–Midway Limousine Serv.,* 924 F.2d 692, 695 (7th Cir.1991). The traditional economic realities test would find "an individual is an employee if economically dependent on the business to which he or she renders service." *Daughtrey,* 3 F.3d at 1495. Under the hybrid test, however, the Court looks at the economic reality of the situation, but "the focus of the inquiry is the employer's right to control the 'means and manner' of the worker's performance." *Oestman,* 958 F.2d at 305 (quoting *Spirides,* 613 F.2d at 831).

Having already determined that Defendant does not control the means and manner by which Plaintiff conducts his business, the Court turns to consider the economic realities of the situation. Plaintiff is compensated for selling insurance policies solely by commission, with the commission rate established in the agreement. And, payment by commission is recognized as signaling independent contractor status. See *Sica,* 756 F.Supp. at 542; *see also Birchem,* 116 F.3d at 313; *John Cooper Produce, Inc.,* 774 F.2d 433; *Weary,* 377 F.3d at 527 ("... fact that Weary was paid solely upon a commission basis and did not earn a salary lends further support to the conclusion that he was an independent contractor."). Even though Defendant is the sole source of Plaintiff's income, it is Plaintiff's productivity level that determines how much income is received and when the income is received. Additionally, Plaintiff is re-

sponsible for all the agency's financial obligations and pays all taxes and benefits for himself and the agency's other employees. Thus, while Plaintiff does rely on Defendant to pay his commission, Plaintiff is not economically dependent on Defendant as he must rely on his own abilities in selling insurance to generate his income and is responsible for his own financial well-being.

■ In summary, the Court has applied the hybrid test put forth by the Eleventh Circuit and concludes that Plaintiff is an independent contractor. The common law factors point overwhelmingly to this conclusion and Defendant does not control the means and manner by which Plaintiff conducts his business. Indeed, Plaintiff has not cited, and the Court has not found, a single case in which an insurance agent, under similar circumstances, was found to be an employee.[5] See *Birchem*, 116 F.3d at 313 ("... federal courts have consistently held that insurance agents are ... independent contractors..."). Consequently, the Court finds that Plaintiff is an independent contractor.

### C. Discrimination Claims

Since Plaintiff is an independent contractor, he is not protected by Title VII or the ADEA and his claims under these acts fail as a matter of law. *See Wortham v. Am. Family Ins. Group*, 385 F.3d 1139, 1141 (8th Cir.2004) (noting that Title VII and ADEA claims failed as matter of law for independent contractor). The Court reaches this conclusion reluctantly, however, as Plaintiff has provided considerable

evidence that would seem to indicate he was victimized by age discrimination.

### D. State Law Claims

In addition to the federal discrimination claims, Plaintiff has alleged four state law claims. Since there exists complete diversity among the parties, the Court will exercise jurisdiction over these state law claims and consider them each individually at this juncture.

### 1. Breach of Agreement/Loss of Business Opportunity

■ Plaintiff alleges that an implied contract for benefits was created when Defendant set forth opportunities and benefits and that Defendant breached this implied contract when Plaintiff was denied the opportunity to purchase the BOB. *See* Tab 1, Pl.'s Comp. Pg. 5 ¶ 24–25. From his claim, the Court can only assume that Plaintiff is inferring that an implied contract to allow Plaintiff to purchase a BOB is to have arisen from earlier business opportunities Defendant afforded Plaintiff. There are two types of implied contracts, but Plaintiff's claim fails to fit into either category. Specifically, contracts implied in fact "are true contracts, for the respective obligations of the parties arise from mutual agreement," and only differ from express contracts because the method of acceptance is by conduct rather than words. 7 Ga. Jur. Contracts § 2:2. There is no true contract or mutual agreement between the parties that was accepted by conduct. In comparison, in a contract implied by law "the obligations of the parties

---

**5.** The Court is aware of *Hogan v. Allstate Ins. Co.*, 361 F.3d 621 (11th Cir.2004) (per curiam), in which the district and circuit court assumed without deciding that the agents were employees for purposes of discrimina-

tion suits. However, in that case Allstate treated the agents as employees for tax purposes, where here Plaintiff was treated by Allstate and by himself as self-employed for tax purposes.

are imposed by law for reasons of equity and without regard for the intent of the parties." *Id.* There is not any reason in equity to impose a contract between the parties allowing Plaintiff to purchase the BOB. And, there are no facts that would warrant inferring or imposing a contract between the parties concerning buying the BOB from earlier various benefits Defendant had made available. Consequently, no genuine issue of material fact remains on Plaintiff's claim for breach of an implied contract since no implied contract exists. *See Jones v. Cartee,* 227 Ga.App. 401, 489 S.E.2d 141, 145 (1997) (affirming that where no contract exists there can be no action for breach).

Furthermore, there is no evidence before the Court that there was any sort of mutual agreement or understanding that could be construed as a contract between the parties regarding Plaintiff's purchase of a BOB other than the language contained within the agreement. Plaintiff bases his claim for breach of contract on the agreement, which is yet another bar to Plaintiff's claim for breach of an implied contract. *See Fed. Ins. Co. v. Westside Supply Co.,* 264 Ga.App. 240, 590 S.E.2d 224, 232 (2003) (explaining that claim on express contract moots a simultaneous claim on theory of implied contract).

### 2. Breach of Independent Contractor Agreement

Pointing to the agreement as the contract that established and governed their relationship, Plaintiff contends that Defendant breached this contract when he was denied the opportunity to purchase the BOB. *See* Tab 1, Pl.'s Comp. Pg. 6 ¶ 28. The agreement restricts the transfer of an interest, in whole or in part, in an agency to those transfers that receive "prior writ-

ten approval of the Company." Tab 47, Ex. 5 Pg. 7. In fact, agents seeking approval for a transfer have "the obligation to notify the Company of a proposed transfer of interest" and Defendant reserves the right "in its exclusive judgment to approve or disapprove such a transfer." Tab 47, Ex. 5 Pg. 7. Furthermore, the manual instructs that existing agents may have the opportunity to "be approved as a buyer" of the interest in another agent's "book of business." Tab 47, Ex. 6 Pg. 26. And, the manual goes on to establish criteria that the buying agent must meet and to make clear that the "buyer is always subject to final company approval." Tab 47, Ex. 6 Pg. 27. It is the provision of the agreement governing transfers of BOBs that Plaintiff contends was breached.

■ The Court is unable to find that Defendant breached the agreement for two reasons. First, it is doubtful, from this evidence before the Court, that Defendant has committed a breach of contract. Breach of contract is defined as "violation of a contractual obligation, either by failing to perform one's own promise, by repudiating it, or by interfering with another party's performance." Black's Law Dictionary 200 (8th ed.2004). Defendant did not directly, by its own actions, or indirectly, by interference, breach the agreement provision governing the sale of a BOB between existing agents, nor did Defendant in anyway repudiate the R3001 agreement it made with Plaintiff and all other independent contractor agents. No proposal was submitted for Defendant to deny directly, and Defendant did not disrupt, become involved with, or participate in the formation or execution of any contract regarding the purchase of Mr. Clements' BOB. To prove and recover for a breach of contract, Plaintiff is required to show "the

breach and the resultant damages" from "the contract being broken." *Budget Rent–A–Car of Atlanta, Inc. v. Webb,* 220 Ga.App. 278, 469 S.E.2d 712, 713 (1996). As Plaintiff is unable to show a breach of the agreement, it follows that he is unable to prove a claim for breach of contract. Moreover, Plaintiff may have breached his obligation to notify Defendant of a proposed transfer by never submitting the terms and conditions of the deal he had reached with Mr. Clements.

A second reason that Plaintiff is unable to recover for a breach of contract is that Defendant retained the right, as a term of the agreement, to approve or disapprove any sale of a BOB between existing agents. *See* Tab 47, Ex. 6 Pg. 27. Thus, even if Plaintiff had submitted a proper proposal for the transfer of Mr. Clements' BOB, Defendant could have denied the transfer without being liable for a breach of the contract. *See Sowell v. Blackman,* 236 Ga.App. 705, 512 S.E.2d 713, 716 (1999) ("No liability exists for procuring a breach of contract when the breach is caused by the exercise of an absolute right.") (citing *Halverson v. Murzynski,* 226 Ga.App. 276, 487 S.E.2d 19 (1997)); *see also AFLAC v. Williams,* 264 Ga. 351, 444 S.E.2d 314, 316 (1994) (finding that client had absolute right in contract to terminate lawyer, so lawyer could not recover for client exercising contractual right to terminate).

### 3. *Fraud, Deceit, Intentional and/or Negligent Misrepresentation*

Stating that Defendant fraudulently made material misrepresentations concerning his rights under the agreement, Plaintiff claims he relied upon these misrepresentations to his detriment when he sought to purchase the BOB but was denied that opportunity based on the terms of the agreement. *See* Tab 1, Pl.'s Comp. Pg. 7 ¶ 32–33. According to Plaintiff, Defendant made the misrepresentations either intentionally, intending to deceive him as to the requirements for purchasing a BOB, or negligently failed to correctly inform Plaintiff as to the requirements for purchasing a BOB. *See* Tab 1, Pl.'s Comp. Pg. 7 ¶ 32. Plaintiff has listed four causes of action in this one claim, however, fraud, deceit and intentional misrepresentation are all essentially the same cause of action as each requires Plaintiff to show that Defendant has intentionally made a false statement. *See Rhone v. Bolden,* 270 Ga. App. 712, 608 S.E.2d 22, 31 (2004) ("The five elements of fraud and deceit are: (1) false representation made by defendant; (2) scienter; (3) intention to induce plaintiff to act or refrain from acting in reliance by plaintiff; (4) justifiable reliance by plaintiff; and (5) damage to plaintiff."); *see also Segars v. Cleland,* 255 Ga.App. 293, 564 S.E.2d 874, 879 (2002) (stating "[i]n order to prove a fraud claim, a plaintiff must present evidence of an intentional misrepresentation..."). In addition, Plaintiff's negligent misrepresentation claim is also predicated on a showing that false information was promulgated by Defendant. *See Marquis Towers, Inc. v. Highland Group,* 265 Ga.App. 343, 593 S.E.2d 903, 906 (2004) (listing elements of negligent misrepresentation as "'(1) the defendant's negligent supply of false information to foreseeable persons, known or unknown; (2) such persons' reasonable reliance upon that false information; and (3) economic injury proximately resulting from such reliance.'") (quoting *Hardaway Co. v. Parsons, Brinckerhoff, Quade & Douglas, Inc.,* 267 Ga. 424, 479 S.E.2d 727, 729 (1997)).

Given the essential elements of each of these causes of action, the short-

coming of Plaintiff's claim is that there was no false statement nor any false information provided to him. Pointing to the statement concerning the requirement that he have a securities license in order to purchase the BOB, Plaintiff claims that fraud or deceit or a misrepresentation occurred. *See* Tab 47, Pl.'s Dep. Pg. 220 Line 21 –25. Plaintiff was made aware of this requirement for purchasing the BOB through correspondence with Mr. Curtis and Mr. Baumgardner. *See* Tab 47, Ex. 7 & 8. The information provided through the correspondence with both Mr. Curtis and Mr. Baumgardner was correct, and Plaintiff, in fact, admits that the information was not false. *See* Tab 47, Pl.'s Dep. Pg. 73 Line 8—12. Moreover, the manual, dated January 2002, that governed the terms of Plaintiff's relationship with Defendant at this time, states the same requirements for purchasing a BOB that Mr. Curtis and Mr. Baumgardner articulated to Plaintiff. *See* Tab 47, Ex. 6 Pg. 26 –27. Consequently, the Court cannot find a falsity that is able to support these tort claims.

Plaintiff also mentions a general feeling of distrust and dislike with the agreement and the requirement that an existing agent must have a license to sell securities in order to purchase another BOB. *See* Tab 47, Pl.'s Dep. Pg. 220 Line 11 –20. Plaintiff insinuates that the agreement was amended to include requirements and provisions that were inconsistent with his position as an insurance salesman. *Id.* However, the agreement allows Defendant the right to amend the supplement and manuals that provide the working details of the agreement at any time without notice to Plaintiff. *See* Tab 47, Ex. 5 Pg. 1 ¶ ID. Thus, while Plaintiff may not like or agree with the terms of the agreement, this general displeasure does not translate into a

false statement or false information sufficient to support a claim for fraud, deceit, and intentional/negligent misrepresentation.

### 4. Intentional Interference with Contract

Alleging that there was a contractual relationship between he and Mr. Clements concerning the BOB, Plaintiff asserts that Defendant interfered with his contractual rights. *See* Tab 1, Pl.'s Comp. Pg. 8 ¶ 38. In bringing this claim, Plaintiff's contention is that Defendant has committed tortious interference with business and contractual relations. A claim for tortious interference consists of: "(1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of contractual obligations or caused a party or third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff." *Dalton Diversified, Inc. v. Am-South Bank,* 270 Ga.App. 203, 605 S.E.2d 892, 897–98 (2004) (citing *Blakey v. Victory Equip. Sales,* 259 Ga.App. 34, 576 S.E.2d 288, 293 (2002)). In this situation, privilege is defined as "'a legitimate or bona fide interest of the defendant or a legitimate relationship of the defendant with the contract, which causes the defendant not to be considered a stranger, interloper, or meddler to the contract.'" *Carey Station Village Home Owners Assoc., Inc. v. Carey Station Village, Inc.,* 268 Ga.App. 461, 602 S.E.2d 233, 234 (2004) (citing *Culpepper v. Thompson,* 254 Ga.App. 569, 562 S.E.2d 837 (2002)). Applying this definition, Georgia courts have reasoned that "all parties to a comprehensive interwoven

set of contracts are not liable for tortious interference with any of the contracts or business relationships." *Id.* at 235 (citing *Galardi v. Steele–Inman,* 266 Ga.App. 515, 597 S.E.2d 571 (2004)).

 Plaintiff's claim for tortious interference with contractual and business relations fails for two reasons. First, there is no evidence before the Court that Plaintiff had entered into a contract to purchase Mr. Clements' BOB. Plaintiff states that he "felt like we had a—we had a deal." Tab 47, Pl.'s Dep. Pg. 108 Line 6 – 7. Even though Plaintiff felt as though he and Mr. Clements had a deal, he concedes that no contract was entered into and that no contract was presented to Defendant for approval. See Tab 47, Pl.'s Dep. Pg. 108 Line 25, Pg. 109 Line 21, Pg. 118, 4 – 8. Also, while there is a handwritten proposal Plaintiff sent Mr. Clements as an offer to purchase his BOB, there is nothing in writing to memorialize any assent to terms, agreement, deal, or contemplated contract. See Tab 47, Pl.'s Dep. Pg. 111 Line 3. Consequently, given the definition of a contract, it is unlikely that there was any relationship with which Defendant could have interfered. See *TranSouth Fin. Corp. v. Rooks,* 269 Ga.App. 321, 604 S.E.2d 562, 564 (2004) (quoting OCGA § 13–3–1 (Michie 1982)) (listing the elements of contract as " 'there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate.' ").

The second reason Plaintiff's claim fails is that Defendant is a privileged actor. As shown by Plaintiff's claim for breach of contract, the agreement was the contract that controlled the relationship Defendant maintained with its independent contractor agents, such as Plaintiff and Mr. Clements. Any contract between agents to purchase a BOB would have to be approved by Defendant, as admitted by Plaintiff and as set forth by the terms of the agreement. *See* Tab 47, Pl.'s Dep. Pg. 110 Line 9–10. Thus, the result is at least two interwoven contracts, the agreement and the purchase contract, between Plaintiff, Mr. Clements, and Defendant. Defendant has a legitimate relationship with any contract between agents to purchase a BOB and, therefore, is a privileged actor. And, being a privileged actor prevents Defendant from committing tortious interference.

## IV. CONCLUSION

According to the foregoing reasoning, Plaintiff's status as an independent contractor renders federal discrimination statutes inapplicable. In addition, no genuine issue of material fact remains as to Plaintiff's state law claims. Therefore, Defendant's Motion for Summary Judgment is **GRANTED.**